DOWDALL and others *v.* Lenox and others.

The statute against usury does not apply where a loan is made to be returned within a certain time or upon a certain event depending upon a casualty which hazards both principal and interest without any right to look to the borrower.

Where a monied transaction is substantially a loan, upon an understanding that the money or thing is to be returned at all events, the lender cannot lawfully reserve to himself any thing in the shape of interest or profit beyond the amount of legal interest. Nor will any shift or contrivance take the case out of the statute.

The test of usury is: whether the substance of the transaction is really a loan of money or the creation of a debt, whatever may have been the form of the contract; and if it be a loan, then whether the lender or payee has stipulated for or secured to himself by means of the loan and arising either from it or from any thing connected with it and forming part of the same transaction, any profit or pecuniary advantage he would not otherwise have been entitled to exceeding the rate of interest allowed by law?

N. owed L. $4500. The former applied on behalf of himself and D. to L. for a loan of $60,000 to purchase a cargo, and so that the old debt of N. of $4500 was to be secured by the same bond and in the same way whereby the $60,000 was to be secured. In fact, a bond was given by N. and D. with a surety for $64,500 and interest, and L. also held the return cargo (as had been agreed) for better security. *Held,* that the adding of N.'s old indebtedness of $4500 to the $60,000 borrowed by N. and D. did not make the matter usurious either as between N. and L. or D. and L.

A question of usury.

George R. Dowdall and Edward H. Nicoll, in the month of May, one thousand eight hundred and twenty-nine, projected a voyage to Canton on their joint account. It was to be performed by the ship Ajax, commanded by Dowdall. In order to effect it, Edward H. Nicoll applied to the defendant, Robert Lenox, for a loan of sixty thousand dollars, in specie. After some conversation between the latter parties, the application was reduced to writing, as follows:

" To Robert Lenox, Esquire,

" Captain George R. Dowdall, in conjunction with myself, will take from you $60,000 to be shipped on board the Ajax for Canton on the following terms, viz. interest at seven per cent. per annum. The property to be insured by Dowdall and myself, and the policies made payable to you in case

of loss and lodged in your hands, and four thousand five hundred dollars of the old debt to be secured in the same manner. The bond to be given for $64,500 and to be of the same tenor as those of the Superior and Ajax last voyage. The bond to be dated 15th May, 1829, and to bear interest from that time. The goods to come home free of freight. Bill of lading and invoice under cover to you. $20,000 will be required on the 18th inst. and the balance on the 20th and 22nd inst. New York, 11th May, 1829.

*Edward H. Nicoll.*"

Mr. Lenox assented to these terms. The *four thousand, five hundred dollars of the old debt* was part of a larger amount owing by Edward H. Nicoll individually to Mr. Lenox ever since the year one thousand eight hundred and twenty five; and at which time the former had failed in business and become insolvent: but still he had not been discharged from this indebtedness and the same remained due. Upon a condition of including this amount in the bond and having it embraced by the securities to be given for the desired loan, Mr. Lenox agreed to advance sixty thousand dollars. The money was furnished and shipped on board the Ajax, for the purposes of the voyage; and a bond was executed, by Captain Dowdall and Edward H. Nicoll jointly as principals and by Robert Smith as their surety, for the payment of sixty-four thousand and five hundred dollars with interest at seven per centum per annum—while, as a further security, the policy of insurance, bill of lading and invoice of the outward shipment, as also those appertaining to the return cargo, were placed in Mr. Lenox's hands and were under his control.

Previous to the sailing of the ship, a private agreement between Captain Dowdall and Edward H. Nicoll, specifying the terms upon which the voyage was undertaken as between themselves, was drawn up in writing and executed by them under date of the twenty-second of May one thousand eight hundred and twenty-nine. After reciting their having chartered the Ajax for the voyage and borrowed sixty-four thousand and five hundred dollars from Mr. Lenox upon their bond at seven per cent. interest from its date until paid, then the agreement provided that Captain Dowdall should proceed in the ship to Canton and for which he was to be allow-

1834.

DOWDALL
v.
LENOX.

ed two thousand dollars and ten tons privilege for his services as commander of the vessel; and the sixty-four thousand and five hundred dollars was to be invested in merchandize at Canton, free of commissions, if possible, and likewise all surplus funds on board the ship, after paying port charges; and on the arrival of the ship at New York, the return cargo should be sold with as little delay as possible, free of commissions by either party; and after paying off the bond to Mr. Lenox with the interest thereon and government duties, premiums of insurance, storage, cartage and auctioneer's expenses, then the profits arising from the adventure were to be equally divided between them, and whatever loss might accrue was also to be borne equally. Then followed this clause : " It is further agreed that of the four thousand and five hundred dollars being the premium on the aforesaid loan of sixty thousand dollars to be paid to Robert Lenox, Edward H. Nicoll is to pay two thousand seven hundred dollars and George R. Dowdall is to pay one thousand and eight hundred dollars."

It did not appear, however, that Mr. Lenox was in any way apprised of the making of this agreement nor that he ever knew of its contents. The same was a matter of private arrangement between Edward H. Nicoll and Captain Dowdall and in which they used whatever expressions they thought proper.

The ship performed her voyage ; but Captain Dowdall died at Canton. The money was nevertheless invested in a return cargo, consisting of teas and cassia, and the same, upon the vessel's arrival at New York in the spring of the year one thousand eight hundred and thirty, was duly entered at the custom-house by Francis H. Nicoll, one of the complainants, as executor of Captain Dowdall and on account of the property forming part of his estate—the name of Edward H. Nicoll not appearing openly in the transaction. The cargo was then landed and, in pursuance of the original agreement, was delivered to Mr. Lenox and deposited in his store-house for the purpose of preserving his lien; while custom-house locks were placed upon it for securing the duties. Shortly afterwards Francis H. Nicoll secured portions of the duties by executing bonds, in his capacity of executor,

with himself personally and Edward H. Nicoll as sureties, and obtained permits for the delivery of such quantities of the teas as the secured duties covered. By Mr. Lenox's consent these teas were taken out of the store; and some of them were immediately passed over to Robert Smith, who caused them to be sold. He still held the proceeds.

Subsequently and in the latter part of the month of September one thousand eight hundred and thirty an engagement was entered into between Robert Lenox, Francis H. Nicoll, as executor of Dowdall, and the house of Haggerty, Austin & Co., by which all the teas remaining in store unsold were to be placed in the hands of Haggerty, Austin & Co. to be sold at auction and out of the proceeds of the sales— after retaining their charges, commissions and a sufficient amount to cover the bonds which they might enter into for duties—they were to pay over to Robert Lenox the amount of his claim, specified as being about seventy-one thousand dollars, including interest and storage, and the residue, if any, was to go to Francis H. Nicoll, the executor. Under this arrangement Messrs. Haggerty, Austin & Co. received and sold the property at auction and out of the proceeds paid to Mr. Lenox fifty-nine thousand eight hundred and fifty-seven dollars on account.

Before any further payments were made, the complainants gave a notice forbidding any more money to be paid to Mr. Lenox; and soon afterwards exhibited their bill, which was the foundation for this cause, for an injunction to prevent any more of the proceeds from going into his hands. The injunction was granted, in the first instance, principally upon the ground that the bond being given for sixty-four thousand and five hundred dollars, upon an advance of only sixty thousand dollars was, under the circumstances, void for usury. The injunction was afterwards modified so far as to permit further payments to be made to the extent of sixty thousand dollars and interest upon that sum and charges for storage—leaving the question open with Mr. Lenox as respected the four thousand and five hundred dollars and interest upon it. The balance remaining in the hands of Haggerty, Austin & Co. was sufficient to pay the latter amount.

The question for the court was, whether, as between

Dowdall and Mr. Lenox, the bond for sixty four thousand and five hundred dollars and interest was an usurious one?

1834.

DOWDALL
v.
LENOX.

Mr. *W. Kent* and Mr. *D. B. Ogden*, for the complainants.

Mr. *T. L. Ogden* and Mr. *S. A. Talcott*, for the complainant Robert Lenox.

Mr. *J. P. Hall*, for the defendants Edward H. Nicoll and Robert Smith.

THE VICE-CHANCELLOR:—The objection of usury has been placed upon two grounds: 1st, That interest was reserved to commence on the fifteenth day of May (the date of the bond), whereas, according to the proposals for the loan, the money was not required until the eighteenth, twentieth and twenty-second days of the same month; and, 2nd: That four thousand and five hundred dollars of Nicoll's old debt was added to the sum actually lent, and was included in the bond and an interest of seven per cent. reserved upon the whole amount.

*October 6th.*

I. With respect to the first point. It is not made an objection by the bill that interest was reserved by the contract to commence on a day anterior to the actual loan or advance of the money. In order to give the complainants the benefit of such an objection, they should have put it forward distinctly in their bill. If the money was not advanced and was not intended to be advanced until some time after the day appointed for the interest to commence, then the fact should have been alleged in order that the defendant might have had an opportunity of answering it and, if necessary, of putting in issue the fact of intention to take, by this means, excessive interest. It is true Mr. Lenox has, in his answer, set forth the letter containing the proposals for the loan which, with the additional circumstance of Robert Smith's becoming a co-obligor in the bond, were the terms assented to and finally agreed upon; and the answer also states that the money was accordingly advanced and paid to Edward H. Nicoll in various sums as called for by him and on different days about the time of the date of the bond and in part before and in part after such date, but on what par-

ticular days he cannot now state with certainty. Taking, then, this explanation in connection with what appears on the face of the latter—and it is only from the statements in the answer and not from any thing in the bill that the question upon this point is attempted to be raised—and I see no evidence of any unlawful agreement in respect to the time when the interest was to commence. The sum was large and the convenience of the contracting parties would seem to require that a day should be appointed for the lender to set apart the money and leave it in readiness for the borrowers, in order that the latter might know it was already appropriated and at his command. Such may well have been the object of the parties in the present instance when fixing upon the fifteenth of May for the date of the bond and the commencement of interest upon the loan, although the course of the business did not require the actual delivery of the money to the borrower until some days afterwards. The money might be considered as appropriated to the objects of the loan as effectually as if it had been handed over. In the absence of all evidence and even allegation to the contrary, I am bound to believe Mr. Lenox provided the money on the fifteenth, and from that time forward had it on hand unemployed and set apart for the intended purpose. And in such a case I am of opinion he was entitled to interest from that date. If the fact is not so, the contrary should have been alleged and proved. The expression in the letter that twenty thousand dollars would be required on the eighteenth and the balance on the twentieth and twenty-second is no evidence that the money was not in readiness and to all intents and purposes so set apart as constituting a loan on the fifteenth of May. The term "required," meaning *demanded—needed*, may have had reference only to the delivery or handing over of the money. For these reasons, I think the first objection not sustainable.

II. I come now to the consideration of the second and more formidable question. Usury consists in stipulating for or in receiving, upon a loan of money or for the forbearance of a debt, a greater rate of interest than is allowed by law. There may be cases where more than the legal rate of interest is reserved and still not be within the statute: as

when a loan is made to be returned within a certain time or upon a certain event but depending upon a casualty which hazards both principal and interest and gives no right to look to the borrower. But where the interest only is hazarded in this way and the borrower remains liable to restore the principal, then it is usury. Hence it has become a general rule by which courts of law and equity are governed in giving effect to the statute—subject to some exceptions which I shall presently notice—that where the transaction is substantially a loan upon an understanding that the money or thing lent is to be returned at all events, the lender cannot lawfully reserve or take to himself any thing in the shape of interest or profit beyond the amount of interest at the legal rate ; and no shift or contrivance for this purpose will be allowed to take the case out of the statute.

The exceptions to the rule embrace special and peculiar cases, as where, under some circumstances, the lender can charge commissions for transacting business : *Nourse* v. *Prime*, 7. J. C. R. 69. ; or where a mortgagee out of possession stipulates for the consignment of the produce of the estate mortgaged to be sold by him on commission : *Bunbury* v. *Winter*, 1 J. & W. 255 ; *Sayers* v. *Whitfield*, 1. Knapp's R. 133.

Some of the most frequent instances of what are deemed shifts or contrivances to elude the statute are, where the loan is made in a depreciated currency or in bonds, notes or goods of a less value than their nominal amount, as in *The Bank of the United States* v. *Owens*, 2. Peter's Reports, 527 ;—or, where, in connection with the loan of money and as part of the same transaction, the lender sells to the borrower, while in embarrassed circumstances, lands, goods or other things at a price exceeding their real value and includes the amount in the security for the loan : *Eagleson* v. *Shotwell*, 1. J. C. R. 536 ; *Morgan* v. *Schermerhorn*, 1. Paige's C. R. 544 ;—or where the advance of money, although exhibiting all the characteristics of a loan, is made to assume the form of a purchase of a rent charge or an annuity payable out of lands and exceeding lawful interest upon the sum advanced : *Lloyd* v. *Scott*, 4. Peter's R. 205. And so, likewise, where the borrowing of money is accom-

panied by the grant of a lease by the borrower to the lender, the latter taking advantage of the necessities of the former to obtain a lease at a rent less than the fair yearly value of the lands or upon more advantageous terms than he otherwise could have done at the same time reserving to himself full interest upon the money lent.                              -

There is a numerous class of cases of this description which have arisen in the courts and especially in the Irish chancery in the time of Lord Redesdale and Lord Ch: Manners ; but the doctrine of which has been reviewed and in some degree modified by the late Lord Ch: Hart in *Moore* v. *M'Kay*, 1. Beatty's Rep. 282., (reported likewise, but not so fully upon this point, in 2. Molloy's Rep. 134.)   In all the cases to which I have adverted and in others that might be mentioned, the question seems to have been whether the substance of the transaction was really a loan of money or the creation of a debt, whatever might be the form of the contract; and if found to be so, then whether the lender or payee had stipulated for or secured to himself, by means of the loan and arising either from it or from any thing connected with it and forming a part of the same transaction, any profit or pecuniary advantage he would not otherwise have been entitled to exceeding the rate of interest allowed by law.    That this is the test, appears likewise from the language of Judge Johnson in *Bank of the United States* v. *Owens*, 2. Peters, 537.    He says, " a profit made or loss imposed on the necessities of the borrower, whatever form, shape or disguise it may assume, where the treaty is for a loan and the capital is to be returned at all events, has always been adjudged to be so much profit taken upon a loan and to be a violation of those laws which limit the lender to a specified rate of interest."

It then remains to be seen whether the case in hand is one coming within this principle.    Here was a loan of sixty thousand dollars, to be repaid at all events, with the lawful rate of interest.    This is admitted.    At the same time one of the borrowers was justly indebted to the lender upon former dealings in a large sum of money—this is not attempted to be impeached.

.The existence of such indebtedness would of itself form

a valid consideration for the giving of a bond with surety for the payment and with interest for the forbearance. Such security the creditor might lawfully ask and receive at any time, even though his debtor happened to be insolvent or in embarrassed circumstances. When, therefore, Edward H. Nicoll applied for the loan in order to enable him to undertake a mercantile adventure from which a profitable result could confidently be expected, it was not unreasonable and certainly not improper for Mr. Lenox to make it a condition upon which he would lend him the money that he should include in the security for the repayment a *portion of the existing debt.* In *Ex parte Burton*, 1. Atk. 255., Lord Hardwicke held a bond given under somewhat similar circumstances to be valid and founded upon a good consideration. It is true that in addition to the return of the money lent with interest, the lender obtains by this means a benefit or advantage which he did not before possess, namely, a security for the payment of an old debt with its accruing interest. But this is no more than he is fairly entitled to receive; and when the full amount of the bond happened to be paid, the obligee would not have made a profit beyond lawful interest: for, after all, he has only realized the payment of his debt and the money advanced with such interest for the forbearance and use of his money as the law allows him to charge. How then can it be said that the law has been violated as between lender and borrower or debtor and creditor?

It has been, not inaptly, put in argument:—suppose, instead of one bond for sixty-four thousand and five hundred dollars there had been two bonds given upon effecting the loan, one by Dowdall for thirty thousand dollars with Nicoll as surety and the other by Nicoll as principal and Dowdall as his surety for thirty four thousand and five hundred dollars—could there be a doubt of the obligee's right to enforce the payment of both bonds? and with respect to the latter, would the fact of its covering an antecedent debt, even under the circumstances, furnish any grounds for impeaching it as usurious? This proposition seems me to admit of but one answer: that it would not. If the prior debt had grown out of usurious loans or was founded upon any illegal con-

sideration, being then brought in and made to form a part of the consideration of a new security, the whole would be contaminated with illegality : *Harrison* v. *Hammel*, 5. Taunt. 780. But in the absence of even an allegation to impeach the validity of the previous indebtedness and considering it a demand which Mr. Nicoll was legally bound to pay and willing to secure, no such consequence can possibly follow.

I am satisfied, as the matter stands between Robert Lenox and Edward H. Nicoll, that there is no ground for imputing usury to the transaction.

But it is said : that so far as Dowdall was concerned, the case has a different aspect ; and it is contended that towards him the terms of the loan were oppressive—that the four thousand and five hundred dollars was a premium—that whether it be considered a premium or an old debt of Nicoll's, still, advantage was taken of Dowdall's necessities to draw him in to assume it ; and in either point of view the contract must be deemed usurious with respect to him. From what I have already observed it seems to me impossible to draw this conclusion, provided Captain Dowdall came into the arrangement and signed the bond knowing the additional sum to be an antecedent debt of Nicoll's : for, then he must be viewed as a surety voluntarily binding himself for the debt of another and, like any ordinary surety, not entitled to set up objections affecting the consideration of the instrument and which even the principal debtor would not be at liberty to urge.

There is no positive evidence of Dowdall's knowing or being aware of the fact that the four thousand five hundred dollars included in the bond was for money already owing by Nicoll. But the inference is and I think the court is bound to presume that he was acquainted with the fact. The written application for the loan expressed it ; and although it was drawn up and signed by Nicoll alone, the proposition equally concerned Dowdall and was made as if proceeding from both of them ; and as the terms proposed were accepted and Dowdall subsequently united with Nicoll in carrying the agreement into effect and corresponding in form with the proposal, I think it must be presumed, in the absence of any evidence to the contrary, that he understood

at the time the terms and conditions upon which it was made. It is hardly to be believed that Mr. Nicoll resorted to artifice and induced Dowdall to suppose it was a premium they were to pay to Mr. Lenox and not a debt of his own. And if Dowdall was thus deceived, it was done by his partner in the transaction and who, for the purposes of the negociation, must be considered as his agent; and the remedy, if any, should be pursued against him and not be conducted in such a way as to ask for relief where the party claiming the benefit of the obligation has been guilty of no fraud or concealment.

Nor is there any thing in the circumstance that the borrowers in their private agreement treated the four thousand and five hundred dollars as a premium for the loan, (agreed to be borne by them in certain proportions) which can affect the rights of Mr. Lenox. If it were a pre-existing debt, they could not change it into a premium by calling it so. It remained the same notwithstanding any appellation they might choose to bestow for their own convenience or views. There is no pretence of Mr. Lenox's ever having assented to any change in its character or name.

Viewing the bond in the way I am compelled to believe it was understood and intended by Dowdall, as well as by the other parties to it, as a security for the loan and for the antecedent debt of Nicoll combined and not a covering of a premium, and considering Dowdall a borrower as well as Nicoll— then, according to my judgment, the transaction cannot be construed into usury or an evasion of the statute as between Lenox and Dowdall any more than between the former and Nicoll. It is true that in addition to Dowdall's responsibility for the sum actually lent with interest, Mr. Lenox had him bound for the four thousand and five hundred dollars: but this was money justly owing and Dowdall assumed it as surety in the same manner that Robert Smith became surety for both Dowdall and Nicoll in the same bond. It, therefore, comes back to the old question as regards Nicoll; and after due reflection, I cannot say there is any principle or rule of law which would go to exonerate Dowdall on the ground of illegality in the transaction which would not, at the same time, go to exonerate Nicoll.

It has been suggested that there is something apparent in the transaction itself which was oppressive towards Dowdall and that advantage was taken of his necessities to induce him to execute the bond as a surety for Nicoll's debt; and that it was even carried so far, as between him and Nicoll, that he consented to bear as his own two fifths or eighteen hundred dollars of the amount. If Lenox and Nicoll had combined to induce this consent, by means of the loan and as one of the conditions upon which the money was to be advanced without any consideration moving from Nicoll for that part of their agreement, then, indeed, there might be a sufficient ground for adjudging the contract as void: because Dowdall would have been made to assume the payment of so much money, not as a surety for Nicoll but on his own account, in addition to the money lent. But, with that arrangement and agreement between Dowdall and Nicoll, Mr. Lenox had no concern. As to him Captain Dowdall stood in the light of a surety, with a right to look to his principal for remuneration in case he should be compelled to pay the debt. If he chose to relinquish the right, it was not by the procurement of Mr. Lenox. The question of a good consideration for such relinquishment is a matter exclusively between them. If in this respect it was a *nudum pactum* between Dowdall and Nicoll, then the latter will still be liable to reimburse the complainants this amount of money after it shall have been paid. But with respect to any oppressive means or undue advantage on the part of Mr. Lenox to draw Dowdall in to give the bond and which might form a ground for equitable relief independently of the existence of usury, the bill contains no charges of the kind and there are no circumstances in the case to warrant the interference of the court on this ground.

There is no evidence showing that Dowdall was in such a state of distress or embarrassment as would probably induce a man to agree to hard and oppressive terms of a proffered loan in order to relieve his wants. His condition was not that of a debtor pressed by his creditors and his property about to be sacrificed by forced sales or his person imprisoned and whose anxiety or eagerness to obtain the means of relief would, in some measure, deprive him of the faculty of

acting and judging with the coolness and deliberation which belongs to a free agent.    His incentive was of another kind ; not one arising from distress and pecuniary embarrassment, but from a desire to engage in a profitable enterprize with the confident hope of large gains.    There was time for calculation and reflection ; and if he found the terms of a loan and the responsibilities he must assume to obtain it greater than his anticipated profits would warrant, he had only to reject the terms and abandon the undertaking.    A person in this situation taking up a loan for such purposes and upon terms which may appear to be exhorbitant yet founded upon calculation and the free exercise of his own judgment, however the statute against usury may be violated, cannot be said to be imposed upon by the lender or to have had an advantage taken of his necessities.    It is not the case of distress on one side which the law can notice and of undue influence and oppression on the other : *Ramsbottom* v. *Parker,* 6. Mad. C. R. 5. ; and in this respect I think it is clearly distinguishable from *Browne* v. *O'Dea,* 1. Sch. & Lef. 115. ; *Drew* v. *Power,* Ib. 182. ; and *Molloy* v. *Irvin,* Ib. 310. ; and others of this class which are reviewed in *Moore* v. *M'Kay,* where the able judge who then presided in the Chancery of Ireland concludes by saying " that he considered himself as duly applying the protective policy of the court and as acting in consistency with all preceding judgments, when he decides that to induce the interference of the court, there must be some evidence or legal presumption of the loan being used as a means of restraint or undue influence to obtain an unjust profit."

I consider this a sound conclusion and which may be applied to the present case.    And as there is no such evidence before me and as I consider there can be no such legal presumption from the nature of this particular case, there is no ground for relieving the complainant's testator from the portion of the bond.

This disposes of the objections which go to the avoidance of the bond.    Still, supposing it valid, there is then another point insisted upon by the complainants as a ground for partial relief against the defendant Lenox—and it is this : that he should be left to look to Edward H. Nicoll and Robert

Smith for the proceeds of the teas which were taken out of the store and delivered to them, and that the amount should be credited on the bond or set off against the balance due. There is no foundation for this claim. Mr. Lenox had the whole cargo in his possession and under his control for the security of his debt; but being more than sufficient to pay him he was willing to part with a portion of the property. The complainant, Francis H. Nicoll, in his capacity of executor, accordingly secured the duties on a part and by a power of attorney authorized his name to be used in that way. Custom-house permits were obtained by his means; and by virtue of such permits and under his authority a portion of the goods were delivered from the store and passed into the hands of the persons named. It was immaterial to Mr. Lenox who received the property; and under the circumstances disclosed by the pleadings and according to the proofs in the cause he cannot be made liable to account for it. Besides, I think it is very clear that the agreement between the parties and Haggerty, Austin & Co. removes all difficulty on this point. It recognizes Mr. Lenox's right to be paid in full out of the proceeds of the remainder of the goods put into their hands for sale; and it was entered into after a full knowledge of all the facts in relation to the goods which had gone into the hands of Edward H. Nicoll and Robert Smith. The testimony of Mr. Haggerty has also an important bearing upon this point.

The bill must be dismissed as to the defendant Robert Lenox: but being exhibited by executors and not without some reason furnished by the appearance of the transaction with their testator, the defendant must bear his own costs. The bill must likewise be dismissed as against Messrs. Haggerty, Austin & Co., but with costs to be paid by the complainants or out of any funds belonging to them in the hands of these defendants. As they are mere stake-holders, they are, at all events, entitled to their costs.

With respect to the other two defendants Edward H. Nicoll and Robert Smith: it has been submitted whether the bill should be retained against them for the purpose of adjusting the accounts between them and the complainants as

executors? although the bill does not appear to have been framed for this purpose, yet the specific relief prayed for embraces the subject of the teas in the hands of Robert Smith; and as the general prayer for such and further relief as the nature of the case may require is in the conjunctive, any thing in addition to the specific relief which is prayed for and not inconsistent with it and which the case made by the bill will warrant, may be decreed, I am inclined to think that the adjustment of Robert Smith's accounts are within the scope of the bill. Edward H. Nicoll appears to be a necessary party to the taking of such accounts. I shall retain the bill for this purpose; and order a reference accordingly—reserving the question of costs between these parties and all further directions.