ELIZABETH C. NORTON

*v.*

SAMUEL NATHANSON et ux.

[Submitted November 4th, 1915. Decided January 11th, 1916.]

1. When a party is compelled to take goods at more than the market price in order to obtain a loan, the transaction is usurious. No contract, however framed, is good if the ultimate effect would be to secure more than the legal rate of interest.

2. Where one man purchased land from another, at an exorbitant price, for the purpose of obtaining a loan, the seller making the loan to induce the purchase, the transaction was usurious, and the difference between the value of the land and what it was sold for may be deducted from the debt.

3. The inquiry is not merely whether lands, goods or securities were sold for more than their market value, but whether the property was sold and bought above its market price as part of the bargain for the loan of money.

4. The burden of proving usury is upon the parties setting it up. The facts necessary to constitute it must be clearly established beyond reasonable doubt by the decided preponderance of evidence. It is not enough that the circumstances proved render it highly probable that there was a corrupt bargain; such a bargain must be proved and not left to conjecture.

5. Parties to a usurious contract can do nothing which will have the effect to validate it so as to deprive the debtor of his right to defend on the ground of usury, except by expunging its usurious element.

6. The defendant loaned the complainant $5,200 and sold her lands for $6,800, taking as security three mortgages aggregating $12,000. Upon bill filed to set aside the transaction, evidence examined and *Held* that the complainant's claim that the land was sold at an exorbitant figure and that the loan was made to induce the purchase, was not established by the evidence.

On final hearing.

*Mr. Aaron V. Dawes,* for the complainant.

*Messrs. McDermott & Enright* and *Mr. William A. Stevens,* for the defendants.

BACKES, V. C.

The object of this bill is to set aside a transaction on the ground of usury. The defendant conveyed to the complainant a property called Castle Garden for $6,800, and loaned her $5,-200. In acknowledgment she assigned to him a mortgage of $5,000 on two houses and lots on Cooper avenue; executed a mortgage for $4,000 on lands known as the Edwards Tract, and one for $3,000 on Castle Garden. All of the property is located at Long Branch. The defendant foreclosed the $5,000 mortgage and took title under a sheriff's deed. The other two mortgages are being foreclosed. The complaint is, that at the time of the deal, Castle Garden was not worth more than $3,500, and that the complainant was compelled to take it at $6,800 to obtain the loan; in short, that a bonus of $3,300 was exacted for the $5,-000 loan. The relief sought is that upon payment of the loan,

and a reconveyance of Castle Garden, the defendant be decreed to hand back the securities. The defence of usury is set up in the two pending foreclosure suits, and the three cases were tried as one.

The decision of the case turns upon the question whether the loan was made to induce the purchase of Castle Garden at an exorbitant price, for, if it were, then the contract to pay the excess was a violation of the statute which forbids the taking, directly or indirectly, for loan of any money, above the value of $6, for the forbearance of $100 for a year. *Comp. Stat. p. 5704.* In the construction of the statute against usury the courts have held, with undeviating uniformity, that where the real transaction was a loan of money, no shift could evade the statute. No matter under what guise the loan was concealed, whether by sale of goods, transfer of stock, taking bond for larger amount than loaned, passing off depreciated paper, or by any other expedient, the court will strip off the guise, and ascertain the true nature of the transaction. When the real transaction is a loan of money, and the lender attempts to receive from the borrower more than the amount actually advanced with lawful interest, no matter under what pretext, it contravenes the policy of the statute, and incurs its penalty. Both the English and American authorities, in support of this principle, are very numerous. *Campion* v. *Kille, 14 N. J. Eq. 229.* Lord Mansfield, in *Floyer* v. *Edwards, 1 Cowp. 112; 98 Eng. Reprint 995,* says that "if the substance is a loan of money, nothing will protect the taking more than five per cent.; and though the statute mentions only 'for loan of moneys, wares, merchandise, or other commodities,' yet any other contrivance, if the substance of it be a loan, will come under the word 'indirectly.' " The inquiry is not merely whether lands, goods or securities were sold for more than their market value, but whether the property was sold and bought above its market price, as part of the bargain for the loan of money. Where one man purchases land from another, at an exorbitant price, for the purpose of obtaining a loan, the seller making the loan to induce the purchase, the transaction was usurious, and the difference between the value of the land and what it was sold

for may be deducted from the debt. *Earnest, Administrator,* v. *Hoskins, 100 Pa. St. 551; 39 Cyc. 929.*

We must then inquire into what the value of Castle Garden was within the reasonable conception of the parties, and was it taken over at a higher figure, as a part of the bargain for the loan of the money. It rests on the complainant to show the value. *Grosvenor* v. *Flax and Hemp Co., 2 N. J. Eq. 453.* The complainant's contention is that on November 20th, 1912, she agreed to buy the Edwards Tract for $7,000, plus taxes, and, before doing so, her husband obtained the defendant's assurance that he would lend her $5,000 towards the purchase-money; that later on he declined to advance the money unless the complainant would buy Castle Garden at the figure named, and give the securities above stated, and that being unable to get the money elsewhere to pay for the Edwards Tract, she, under pressure of the circumstances, after some show of resistance, submitted to the imposition. This, in substance, is the testimony of Mr. Norton, the complainant's husband, who dealt for her, or, rather, as I am inclined to believe, negotiated his business affairs in her name. In all of the transactions disclosed by the record, she was negligible. The defendant's version is: He held a mortgage of $4,000 on Castle Garden that had been foreclosed, and at the sale of which, in October, 1912, he was the purchaser at $5,400.90, the principal and accumulated interest of his debt and the costs of the suit. Objections were filed to the confirmation of the sale by Norton, who was a subsequent encumbrancer, and by the Lerner Block Norton Company, a creature of Norton's, which held the fee, on the ground that the defendant's decree was excessive, in that there had been paid $500 on account of the principal and also some interest, for which credit had not been given. While the objections were pending, the defendant says Norton and Mr. Lerner, of Norton's company, dickered with him from time to time for the property, for which he asked $7,500, and, finally, in December, agreed to $6,800 as his lowest figure. The matter then hung fire, he relates, until January following, when Norton applied for a loan of $5,000, which he promised to make, Norton agreeing at that time to take Castle Garden at $6,800. He admits he

"did not think he would have let Norton have the loan unless he straightened out the Castle Garden matter; that he didn't say he wouldn't; he was willing to, and said to him that if he would straighten it out, he would let him have the money."

The defendant allows he was anxious to clear up the affair, and explains that with the objections hanging, he couldn't do anything with the property, adding, that if it had not been for the objections he would not have been so anxious.

The sale and the loan were associated and regarded by both parties as a $12,000 transaction, and the issue of fact calling for settlement is, was the price of Castle Garden the result of a deliberate bargain, and as such simply an element of the debt of $12,000; or was it coerced to augment the debt to that sum? I do not intend to imply that to establish usury, oppression must be proved, for oppression is presumed in law when usury is a settled fact, however it may have been obtained. The burden of proving usury is upon the party setting it up, and the facts necessary to constitute it must be clearly established beyond reasonable doubt by the decided preponderance of evidence. It is not enough that the circumstances proved render it highly probable that there was a corrupt bargain; such a bargain must be proved and not left to conjecture. *Berdan* v. *Trustees, &c., 47 N. J. Eq. 8; affirmed, 48 N. J. Eq. 309.* I take little stock in Norton's story that the defendant had promised the money and that he was pinched into the arrangement by the dilemma of its refusal. Norton says that the promise was made before he agreed, on November 20th, to buy the Edwards Tract, and that Castle Garden was injected afterwards. He puts it as much as a week before that time (although later he said it might have been on the same day, when the impossibility was pointed out), but in this he must be mistaken, because it appears that the Edwards Tract was offered at public auction by the receiver of the Edwards company on the afternoon of November 19th, and struck off to a purchaser who failed to comply with the terms of the sale. Norton admits that he did not attend the auction and knew nothing of it until afterwards, yet, on the following day, he made a private bargain for the property and gave his check for $200 as a forfeit. The events are not in dispute and they shake con-

fidence in the correctness of the claim that he had a promise of the money so far in advance. And, further, Norton's concern was at the time in default to the defendant, and Norton was in actual hostile litigation with him over his asserted rights. Now, is it likely in these circumstances that he would seek the defendant's help in a new speculation, and that the defendant would promise his aid with so large a sum, without first having adjusted their differences? It is also asking much of the court to accept Norton's viewpoint, that relying upon the defendant's promise, the refusal of the money at the last minute placed him in a situation where he was compelled to submit to the extortion. It appears that Norton's wife at that time held the $5,000 mortgage, well secured on the Cooper avenue property, and the Edwards Tract (cheap at $7,000) was about to be conveyed to her, to pay on which she had $2,000. It is incredible that upon these properties less than fifty per cent. of their clear value could not have been raised at any money institution and at six per cent., the rate promised to the defendant. Such securities are rare, and for them money is a ready commodity. I appreciate that Norton and his wife testified that they tried to raise the money elsewhere and couldn't, but of this I have misgivings. They were seemingly not pressed for time in which to get it. It does not appear what the condition of the Edwards' sale was, as to when it was to be closed, but the record does show that the receiver's deed bears date January 24th, 1913, which may be assumed to be the agreed date for its delivery, and it is also shown that the defendant's check for $5,200 is dated February 25th following, and that the deed was not recorded until March 3d. Thus, it appears that at least a month elapsed between the time, as the Nortons say, pressure was brought to bear upon them and when they succumbed. In the meantime there was small danger of losing the prize of the Edwards Tract, and much time in which to turn themselves.

The Nortons further advance that they submitted to this unconscionable exaction of $3,300 to save a forfeiture of the $200 earnest money paid on the Edwards Tract, and also that the prospective profit of that purchase was a persuasive factor, from which they hoped to recoup. The first borders on the absurd,

and the second is disingenuous. Norton is a sharp, shrewd, trader and a man of affairs, far superior in intelligence, in the financial and commercial sense, to the defendant, and it is highly improbable that he was lured to the imposition by the glowing prospects of the Edwards' purchase, especially when he had abundance of opportunity to escape. It seems to me that his reason for paying what he now declares to be excessive value may fairly be attributed to another and more covetous motive.

That Norton and the defendant negotiated at arms' length for the sale of Castle Garden, and long before the loan was made, is shown pretty clearly by the proofs. Castle Garden is a large, two-story frame structure, covering the whole of an irregular-shaped lot at the corner of North Broadway and Long Branch avenue, running fifty feet on North Broadway and ninety-two feet on Long Branch avenue. The other lines are forty-seven feet by seventy-four feet. It is on the most prominent business street of Long Branch, though perhaps not in the more desirable locality. The first floor is taken up by three small stores, and the rest is cut up into twenty-four rooms used for tenements. It was a wheelwright and blacksmith shop, remodeled and added to. It has a dilapidated appearance and is sadly in need of repairs, due to neglect during the past few years. It was in better shape when the defendant sold it to the Nortons three years ago. Groups of three rooms rent for $7 and $8 a month; one store for $20, and the other two for $10 each, a renting capacity of approximately $100 a month. The yield, however, is less by at least one-half, due very much to lack of care and proper management. Norton says it was worth about $3,500. His partner, Lerner's, opinion is that $3,500 to $4,000 would be a fair price. Holtson, a real estate and insurance agent, says $3,500 or $3,-600. Mr. Chandler, another of the complainant's witnesses, estimates its value at $5,000. The defendant's witness Green, a real estate dealer, values the land at $2,000 and the building between $4,000 and $4,500. William H. Brehm, an owner of and dealer in property in the immediate locality, thought $7,000 a fair price. His judgment is based largely upon an income capacity of $100 a month, which he says, with care, it could be made to produce. The defendant says he valued it at and his asking

price was $7,500. Jarsky, another witness in his behalf, a real estate dealer, puts the value at $8,000. The opinions, standing alone, are of very little help, but the circumstantial testimony in the case, much of which is not disputed, fairly indicates what the contracting parties thought and regarded the property to be reasonably worth. The evidence of the complainant of estimates approximately of $3,500, is inadmissible. Holston considers the land worth $2,500 and the building $1,000, although for the past seven years he carried fire insurance on it for $3,000, and this after inspection and appraisal. The insurance at one time during this period was $4,000. When Lerner bought the property, in 1907, he paid $4,750, and afterwards improved it, spending $1,000 to $1,500 in remodeling and repairs. In addition to the defendant's $4,000 mortgage lien, Norton and his associate placed two or three blanket mortgages on it, aggregating upwards of $10,000. This, to my mind, indicates that they considered their equity of some, if not considerable, value. They wanted the defendant's mortgage foreclosed, possibly to wipe out the subsequent liens, and when they found that the defendant and not they were to gain the benefit of the sale, they objected to its confirmation. While the grounds of the objection do not assail the bid of $5,400 as inadequate, it seems to me that inasmuch as the objection could not be sustained, except on this ground (*Cropper* v. *Brown, 76 N. J. Eq. 406*), it is to be presumed to have been within their contemplation; and suggestive is Norton's reason for filing them—that he "did not want Mr. Nathanson to get away with the property without paying the different ones that had claims against it what was their dues." I think it is a fair inference that they regarded the defendant's bid of $5,400 as inadequate, under the peculiar and disadvantageous circumstances in which they found themselves. Jarsky, the real estate agent already mentioned, testified that in the fall of 1912 Norton asked him to sell the property, and when asked how much he wanted, said that he had paid $10,000 for it. That one Chris Brehm offered him (Jarsky) $7,500 for it, which he submitted to Lerner, who replied that he would take no less than $9,000, his bottom price; and that later he saw Norton, who turned down the offer. Norton denies this, and Lerner says he

don't remember. Brehm, to some extent, corroborates Jarsky, in that he says Jarsky showed him the property and asked $9,000 for it, and that while he did not make an offer of $7,500 in cash, he did say he did not think he would pay over $7,500 for it. And we have this undisputed evidence given by a disinterested and believable witness: Miss Throckmorten, a stenographer in the law office of Mr. Benjamin Morris, says that in the summer of 1912, Lerner and Norton applied to Mr. Morris for a loan on Castle Garden, of between $4,000 and $5,000, and that "they stated the property was worth at a low valuation $8,000; but that it brought an income (on) $10,000, bringing in about $1,-000 a year rental." While these facts may not prove Castle Garden to have been worth $6,800 at the time of the sale, they tend to show the mood in which the parties approached the negotiation, and shed light upon whether it was a sale or a hold-up.

There is little room to doubt that after the defendant purchased Castle Garden at sheriff's sale, the Norton-Lerner combination (and I speak of them as such because it is patent that the complainant, Mrs. Norton, was a mere cipher and that her husband and Lerner were the real parties in interest in the Edwards purchase and in Castle Garden) was keen to get it back and at the lowest price it could be had. Lerner's testimony evinces this. He admits he tried several times before the loan was spoken of. They wanted to buy and the defendant was ready to sell, but for no less than $6,800—the odd figure of $6,800 indicates that they haggled—and in this situation the agreement was reached and it does not appear to have been otherwise than upon the basis of what Norton and Lerner at that time regarded the property to be worth to them. Now, in this state of affairs, how can it be said that the agreement of the defendant to make the loan, if they would buy at his figure, was unlawful? The question is not whether the purchase price was in fact in excess of the fair market value, but the decisive point is, was it mutually recognized as such and was the sale induced exclusively by the promise of the loan? I do not find this established.

On the whole case, I feel that the complainant is much in the same position that Dowdall was, in *Dowdall* v. *Lenox, 2 Edw.*

*Ch. 267*, which Vice-Chancellor McCoun discusses in a manner fitting to the present situation. He says:

"There is no evidence showing that Dowdall was in such a state of distress or embarrassment as would probably induce a man to agree to hard and oppressive terms of a proffered loan in order to relieve his wants. His condition was not that of a debtor pressed by his creditors and his property about to be sacrificed by forced sales or his person imprisoned and whose anxiety or eagerness to obtain the means of relief would, in some measure, deprive him of the faculty of acting and judging with the coolness and deliberation which belongs to a free agent. His incentive was of another kind; not one arising from distress and pecuniary embarrassment, but from a desire to engage in a profitable enterprise with the confident hope of large gains. There was time for calculation and reflection, and if he found the terms of a loan, and the responsibilities he must assume to obtain it greater than his anticipated profits would warrant, he had only to reject the terms and abandon the undertaking. A person in this situation, taking up a loan for such purposes, and upon terms which may appear to be exorbitant, yet founded upon calculation and the free exercise of his own judgment, however the statute against usury may be violated, cannot be said to be imposed upon by the lender or to have had an advantage taken of his necessities. It is not the case of distress on one side which the law can notice and of undue influence and oppression on the other (*Ramsbottom* v. *Parker, 6 Mad. C. R. 5*); and in this respect I think it is clearly distinguishable from *Browne* v. *O'Dea, 1 Sch. & L. 115;* *Drew* v. *Power, Ibid. 182*, and *Molloy* v. *Irvin, Ibid. 310*, and others of this class which are reviewed in *Moore* v. *M'Kay*, where the able judge, who then presided in the chancery of Ireland, concludes by saying: 'That he considered himself as duly applying the protective policy of the court, and as acting in consistency with all preceding judgments, when he decides that to induce the interference of the court, there must be some evidence or legal presumption of the loan being used as a means of restraint or undue influence to obtain an unjust profit.'"

Moreover, the conduct of the Nortons, after the loan and

until this suit was brought, is significant. While parties to a usurious contract can do nothing which will have the effect to validate it, so as to deprive the debtor of his right to defend on the ground of usury, except by expunging its usurious element (*Trusdell* v. *Dowden, 47 N. J. Eq. 396*), yet their action may be looked to as reflecting correctly their previous attitude. The defendant advanced the $5,200 in February of 1913, but the title to Castle Garden was not taken by the complainant until the following August, and then without complaint or protest. The Lerner-Nortons have at all times been in possession, collected the rents, and with regularity paid the interest and taxes, and when the defendant foreclosed the $5,000 Cooper avenue mortgage and bought it in at sheriff's sale, Norton entered into an agreement with him that he should purchase it for, and convey it to, the complainant upon the payment of the amount of the decree and costs; and to secure this he paid the defendant the costs of the litigation, amounting to $267. In fact, there was no claim made at any time that usury played a part in the transaction, until after the complainant defaulted on that agreement, and the defendant attempted to collect his dues. The filing of this bill gave the first intimation of the Nortons' dissatisfaction with their bargain. Courts are prone to denounce usury and equity is ever ready to relieve the oppressed; but when its aid is sought, on this ground, it will not only carefully scrutinize the transaction to discover whether the offence has been committed, but will be as watchful to observe that the plea is not the guise of a disappointed dealer in which he seeks to escape liability.

If the defendant had realized $5,400, it would have made him whole, so far as his lien on Castle Garden was concerned, and the taking of the difference between that sum and $6,800 is pointed to as plenary proof of usury. This cannot be affirmed, because the defendant had changed his status from lienholder to owner (*Cropper* v. *Brown, supra; Knickerbocker Tr. Co.* v. *Carteret Steel Co., 81 N. J. Eq. 130, 518*); and it was his privilege to bargain for the best price, and the assumption of illegality is not permissible if that price, though profitable, was agreed upon by the parties, influenced by their impressions of the value of the property.

It is also contended that the defendant's admission on the stand, that he would not have let Norton have the loan unless he straightened out the Castle Garden matter, proves that the purchase was made under pressure. I do not so interpret his language or sentiment. His explanation, as already referred to, shows the fix he was in and why he acted. His rights as a purchaser under the sheriff's sale of Castle Garden were then being held up by Norton and others, and his disinclination to further accommodate may properly be ascribed to his resentment of this interference. Further dealings were out of the question, so far as they were concerned, until the objections to the sale were withdrawn and the matter cleared up. The settlement of the litigation may have comprehended the purchase of the property, but the purchase was not necessarily an element of the adjustment. Indeed, it is not a remote supposition that these real estate operators availed themselves of the objections to depress the defendant's price.

The complainant has failed to establish usury and her bill will be dismissed, with costs. The defendant is entitled to a decree in his two foreclosure suits, with costs.